**UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**

| | |
|---|---|
| BRYAN REID, Derivatively on Behalf of Nominal Defendant MGP INGREDIENTS, INC., | ) ) ) |
| Plaintiff, | ) Civil Action No. _____ |
| v. | ) JURY TRIAL DEMANDED |
| DAVID BRATCHER, NEHA CLARK, DAVID COLO, BRANDON GALL, THOMAS GERKE, DONN LUX, PREET MICHELSON, LORI MINGUS, KEVIN RAUCKMAN, KAREN SEABERG, AND TODD SIWAK, | ) ) ) ) ) ) ) |
| Defendants, | ) ) |
| and | ) ) |
| MGP INGREDIENTS, INC., | ) ) |
| Nominal Defendant. | ) |

**<u>VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT</u>**

Plaintiff Bryan Reid ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant MGP Ingredients, Inc. ("MGP Ingredients" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Company's publicly available documents, conference call transcripts and public announcements, United States Securities and Exchange

Commission ("SEC") filings, press releases published by and regarding MGP Ingredients, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of MGP Ingredients against certain officers and members of the Company's Board for breaches of their fiduciary duties, as set forth below.

2.      MGP Ingredients describes itself as a leading producer of premium distilled spirits, branded spirits, and food ingredient solutions.

3.      As one of the largest distillers in the United States, MGP Ingredients' offerings include bourbon and rye whiskeys, gins, and vodkas.

4.      With distilleries in Kentucky, Kansas, Indiana, and Mexico, and bottling operations in Missouri, Ohio, and Northern Ireland, MGP Ingredients has the infrastructure and expertise to create on any scale.

5.      MGP Ingredients' branded spirits portfolio covers a wide spectrum of brands in every segment, including iconic brands from Luxco, which was founded in 1958 by the Lux Family.

6.      Luxco is a leading producer, supplier, importer and bottler of beverage alcohol products.

7.      Luxco's award-winning spirits portfolio includes well-known brands from five distilleries: Bardstown, Kentucky-based Lux Row Distillers, home of Ezra Brooks, Rebel, Blood Oath, David Nicholson and Daviess County; Lebanon, Kentucky-based Limestone Branch Distillery, maker of Yellowstone Kentucky Straight Bourbon Whiskey, Minor Case Straight Rye

2

Whiskey and Bowling & Burch Gin; Jalisco, Mexico-based Destiladora González Lux, producer of 100% agave tequilas, El Mayor, Exotico and Dos Primos; and MGP Ingredients' historic Ross & Squibb Distillery in Lawrenceburg, Indiana, where the Remus Straight Bourbon Whiskey and Rossville Union Straight Rye Whiskey are produced.

8. The innovative and high-quality brand portfolio also includes Everclear Grain Alcohol, Pearl Vodka, Saint Brendan's Irish Cream, The Quiet Man Irish Whiskey, and other well-recognized brands.

9. In addition, the Company's Ingredient Solutions segment offers specialty proteins and starches that help customers harness the power of plants and provide a host of functional, nutritional, and sensory benefits for a wide range of food products.

10. During the COVID-19 pandemic, alcohol consumption in the United States increased substantially. The Company benefitted greatly during this time period, as it increased alcohol production and sales, which in turn improved the Company's financial results.

11. However, by late 2022, demand for alcohol started to decrease, and destocking of alcohol was taking place throughout the industry.

12. As alleged herein, between May 4, 2023 and October 30, 2024 (the "Relevant Period"), the Individual Defendants caused the Company to issue materially false and misleading statements regarding the Company's alcohol inventory.

13. Despite the destocking taking place throughout the alcohol industry, the Individual Defendants assured the Company's stockholders that the Company "cycled through that" and sold a significant portion of its inventory. Defendants claimed that MGP Ingredients' exposure to overstocking was less than its competitors, and that destocking was "not a core issue" because Defendants had properly monitored and managed MGP Ingredients' inventory levels.

3

14.     On May 4, 2023, the Individual Defendants caused MGP Ingredients to issue a press release, also filed with the SEC, wherein the Company announced its 2023 first quarter financial results.

15.     A corresponding earnings conference call was held, during which Individual Defendant David Colo ("Colo"), the Company's then-President, Chief Executive Officer ("CEO"), and director, stated: "Demand for our products in each of our three segments remains strong and we believe our business continues to be well positioned."

16.     However, on February 22, 2024, during a Company earnings call, Individual Defendant David Bratcher ("Bratcher"), then-President, CEO, and director of the Company, disclosed that "inventory destocking at a wholesale level will remain an issue for the branded spirits industry in 2024."

17.     Bratcher attempted to assure investors that the Company "work[ed] closely with our distributors throughout 2023" and "made significant progress in managing wholesaler inventory for our portfolio."

18.     Bratcher further asserted that "[h]ealthy demand for our products continue[s] and we believe our business remains well-positioned."

19.     Following this news, the Company's stock price fell 14.86 percent, or by $13.65 per share, from $91.83 per share on February 21, 2024 to $78.18 per share the following day.

20.     Then on October 31, 2024, the Individual Defendants caused MGP Ingredients to issue a press release, also filed with the SEC, wherein the Company announced its 2024 fiscal year financial results.

21.     In the press release, the Individual Defendants disclosed that MGP Ingredients had to "further lower our net aging whiskey put away, scale down our whiskey production, and

optimize our cost structure to mitigate lower production volumes" due to the "softening American whiskey category trends and elevated industry-wide barrel inventories."

22.    A corresponding earnings conference call was held, during which Individual Defendant Bratcher conceded that "slower growth and higher inventories are leading to lower demand, lower prices and reduced visibility on our contract distilling sales."

23.    During the call, Individual Defendant Brandon Gall ("Gall"), then-Chief Financial Officer ("CFO") of the Company, stated that MGP Ingredients was "significantly reducing our brown goods production to better align with demand in 2025. At the same time, softer American whiskey growth and elevated barrel inventories continue to constrain demand for aged whiskey and increasingly our new distillate."

24.    Following this news, the Company's stock price fell 14.7 percent, or by $8.27 per share, from $56.31 per share on October 30, 2024 to $49.04 per share the following day.

25.    As a result of the foregoing and as set forth in greater detail herein, a securities fraud class action was filed against the Company, captioned *In re MGP Ingredients, Inc. Securities Litigation*, Case No. 1:24-cv-09685 (S.D.N.Y.) (the "Securities Class Action").

26.    The Securities Class Action has caused, and will continue to cause, MGP Ingredients to expend significant funds to defend itself against the claims asserted in that action, and exposed the Company to massive potential class-wide liability.

**<u>JURISDICTION AND VENUE</u>**

27.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R.§240.14a-9) promulgated thereunder by the SEC, Section 10(b) of the Exchange Act (15

U.S.C. § 78(j)) and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC, and Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)).

28.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

29.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

30.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

31.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## **PARTIES**

*Plaintiff*

32.     Plaintiff is, and has been at all relevant times, a shareholder of MGP Ingredients.

*Nominal Defendant*

33.     Nominal Defendant MGP Ingredients is a Kansas corporation with its principal executive offices located at 100 Commercial Street, Atchison, Kansas 66002.  MGP Ingredients' common stock trades on the NASDAQ under the ticker symbol "MGP."

*Individual Defendants*

34.     Defendant Bratcher served as CEO, President, and a Board member of the Company from January 2024 through December 2024.

35.     Defendant Neha Clark ("Clark") has served as a Board member of MGP Ingredients since June 2021. Clark is Chairperson of the Audit Committee. Clark is also a member of the Human Resources and Compensation Committee as well as the Nominating and Governance Committee.

36.     Defendant Colo served as CEO, President, and a Board member of the Company from May 2020 through December 2023.

37.     Defendant Gall has served as interim CEO and President of MGP Ingredients since January 2025 as well as CFO and Vice President of Finance since April 2019.

38.     Defendant Thomas Gerke ("Gerke") has served as a Board member of MGP Ingredients since June 2021. Gerke serves as Chairperson of the Human Resources and Compensation Committee. Gerke is also a member of the Audit Committee as well as the Nominating and Governance Committee.

39.     Defendant Donn Lux ("Lux") serves as Chairman of the Board and has served as a Board member of MGP Ingredients since June 2021.

40.     Defendant Preet Michelson ("Michelson") has served as a Board member of MGP Ingredients since May 2022. Michelson is a member of the Audit Committee, the Human Resources and Compensation Committee, and the Nominating and Governance Committee.

41.     Defendant Lori Mingus ("Mingus") has served as a Board member of MGP Ingredients since June 2020. Mingus serves as a member of the Human Resources and Compensation Committee and the Nominating and Governance Committee.

42.     Defendant Kevin Rauckman ("Rauckman") has served as a Board member of MGP Ingredients since June 2020. Rauckman serves as Chairperson of the Nominating and Governance

Committee. Rauckman also serves as a member of the Audit Committee and the Human Resources and Compensation Committee.

43.    Defendant Karen Seaberg ("Seaberg") has served as a Board member of MGP Ingredients since August 2009. Seaberg serves as a member of the Human Resources and Compensation Committee and the Nominating and Governance Committee.

44.    Defendant Todd Siwak ("Siwak") has served as a Board member of MGP Ingredients since May 2022. Siwak serves as a member of the Human Resources and Compensation Committee and the Nominating and Governance Committee.

45.    Defendants referenced in paragraphs 34 through 44 are herein referred to as the "Individual Defendants."

**INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES**

46.    By reason of their positions as officers and/or directors of MGP Ingredients, and because of their ability to control the business and corporate affairs of MGP Ingredients, the Individual Defendants owed MGP Ingredients and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage MGP Ingredients in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of MGP Ingredients and its shareholders.

47.    Each director and officer of the Company owes to MGP Ingredients and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

48.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of MGP Ingredients, were able to and did, directly and/or indirectly,

8

exercise control over the wrongful acts complained of herein.

49.     To discharge their duties, the officers and directors of MGP Ingredients were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

50.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of MGP Ingredients, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

51.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

52.    To discharge their duties, the officers and directors of MGP Ingredients were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of MGP Ingredients were required to, among other things:

(i)    Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Kansas and the United States, and pursuant to MGP Ingredients' own Code of Conduct;

(ii)    Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii)    Remain informed as to how MGP Ingredients conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv)    Establish and maintain systematic and accurate records and reports of the business and internal affairs of MGP Ingredients and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(v)    Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that MGP Ingredients' operations would comply with all applicable laws and MGP Ingredients' financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

10

(vi)    Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(vii)    Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(viii)    Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

53.    Each of the Individual Defendants further owed to MGP Ingredients and the shareholders the duty of loyalty requiring that each favor MGP Ingredients' interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

54.    At all times relevant hereto, the Individual Defendants were the agents of each other and of MGP Ingredients and were at all times acting within the course and scope of such agency.

55.    Because of their advisory, executive, managerial, and directorial positions with MGP Ingredients, each of the Individual Defendants had access to adverse, non-public information about the Company.

56.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by MGP Ingredients.

<u>**MGP INGREDIENTS' CODE OF CONDUCT**</u>

57.    MGP Ingredients' Code of Conduct, which was last revised on September 25, 2024, provides:

This Code of Conduct is applicable to all directors, officers, and employees of MGP Ingredients, Inc. ("MGPI") and its majority-owned subsidiaries ("we," "our," "us," or the "Company").

We are committed to conducting business with the highest ethical standards, integrity, and social responsibility. We expect you to do the right thing, comply with the law, and act ethically in all matters, and this Code of Conduct is designed to set expectations regarding doing the right thing and the ethical standards that you are expected to follow. You are also expected to be familiar with this Code of Conduct. "You" means a director, officer, or employee of the Company.

58.     The Code of Conduct further states:

Compliance with the Law

If we do not comply with the law, we will create problems for ourselves as well as those around us. Illegal actions damage reputations and erode the confidence and trust that others have placed in us. Accordingly, it is our policy that all laws be obeyed, however insignificant, and that this requirement must be placed ahead of our own personal interests and the Company's operating results. The following are generalized comments on certain areas of the law and Company policies that you should always keep in mind. . . .

Trading in MGPI's Stock and Other Securities. You must comply with insider trading and securities laws that prohibit buying or selling a company's securities while aware of material nonpublic information about a company or providing material nonpublic information to another person who trades on the basis of that information or passes that information to a third party who trades. For more information, see the Company's Insider Trading Policy.

59.     The Code of Conduct continues:

Discipline/Penalties

The policies reflected in this Code of Conduct are important to the Company. Violations will subject offenders to disciplinary action, when and as warranted. Discipline will not necessarily be progressive in nature, which means that the first violation will not necessarily begin with the least severe discipline and then move up one level for each subsequent violation. The appropriate discipline will be given considering the nature of the violation and the individual's history with the Company. Possible disciplinary measures may range from a warning to termination of employment. In addition, a matter may be referred to appropriate government authorities. Violations of law may also give rise to fines or criminal prosecution.

60.     Moreover, the Code of Conduct provides:

Administration

The Audit Committee is responsible for setting the standards set forth in this Code of Conduct and may update it from time to time. Any waiver of this Code of Conduct for members of the Board of Directors or executive officers may be made only by the Audit Committee and will be disclosed to the public as required by law or the rules of the Nasdaq Stock Market, when applicable. Waivers of this Code for other employees may be made only by our Chief Executive Officer or Chief Financial Officer and may be reported to the Audit Committee.

## MGP INGREDIENTS' AUDIT COMMITTEE CHARTER

61.     MGP Ingredients' Audit Committee is governed by its Audit Committee Charter, which was last amended and restated on May 23, 2024.

62.     As set forth in the Audit Committee Charter:

The purposes of the Audit Committee (the "Committee") of the Board of Directors (the "Board") of MGP Ingredients, Inc. (the "Company") are to assist the Board in fulfilling its oversight responsibilities with respect to (i) accounting and financial reporting processes, (ii) financial statement audits, and (iii) monitoring significant risk exposures.

63.     The Audit Committee Charter further provides, in a section titled "Responsibilities and Duties":

The following are the duties and responsibilities of the Committee: . . .

(f) Oversight of Financial Reporting, Financial Statements, and Published Statements. The Committee will:

(i) Review and discuss with management and the Independent Auditor the Company's financial statements and disclosures made in "Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's annual and quarterly reports filed with the SEC on Form 10-K and Form 10-Q and the results of the Independent Auditor's review of the quarterly financial statements included in the Company's Quarterly Report on Form 10-Q.

(ii) Provide a recommendation to the Board as to whether the audited financial statements should be included in the Company's Annual Report on Form 10-K for the applicable fiscal year based on the review and discussions with management and the Independent Auditor relating to the annual financial statements and the audit.

13

(iii) Review and discuss with management earnings press releases, non-GAAP financial measures, earnings guidance, as well as financial information provided to analysts and rating agencies. Such discussions may be done generally (e.g. as to the types of presentations made or the types of information disclosed).

(iv) Review and approve the audit committee report required by SEC rules in the Company's annual proxy statement.

(v) Review and discuss with management and the Independent Auditor the effect of regulatory and accounting initiatives on the Company's financial statements.

(vi) Discuss with the Independent Auditor any matters required to be discussed by applicable requirements of the PCAOB and the SEC, including the Independent Auditor's judgments about the quality, not just the acceptability, of the Company's accounting principles as applied in its financial reporting.

(vii) Discuss with management and the Independent Auditor significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements; any significant changes made by management in the basic accounting principles and reporting standards used in the preparation of the Company's financial statements; all alternative treatments of financial information within generally accepted accounting principles ("GAAP") related to material items that have been discussed with management, including the ramifications of the use of such alternative disclosures and treatments and the treatment preferred by the Independent Auditor.

(viii) Discuss with the Independent Auditor any recommendations of the Independent Auditor with respect to internal controls and other financial matters, including any perceived weaknesses in the Company's internal controls, policies, and procedures, any special steps taken to address material control deficiencies, and any recommendations regarding disclosures about changes in internal control over financial reporting.

(ix) Discuss with the Independent Auditor management's report on internal control over financial reporting and the Independent Auditor's attestation of the report.

(x) Discuss with management any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting which could adversely affect the Company's ability to record, process, or summarize, and report financial data and any fraud, whether or not material, involving management or other employees who have a significant role in the Company's internal control over financial reporting.

(xi) Review and discuss with management and the Independent Auditor material written communications between management and the Independent Auditor, such as (a) any engagement letter or independence letter, (b) any management letter, any

14

schedule of unadjusted differences and a listing of adjustments and reclassifications not recorded, if any, and management's responses thereto, and (c) any reports on observations and recommendations on internal controls.

(xii) Review with management and the Independent Auditor any published reports or any correspondence from governmental agencies which raise material issues regarding the Company's accounting policies or financial statements.

(g) Independent Auditor Fees. The Committee will ask the Independent Auditor to submit annually a written statement of the fees billed in each of the last two fiscal years for each of the following categories of services rendered by the Independent Auditor: audit services, audit related services, tax compliance, tax advice and tax planning services, and other services. . . .

(i) Risk Assessment. Periodically, the Committee will:
(i) Discuss the Company's major enterprise risk exposures, including cybersecurity risks, and any steps Company management has taken to monitor, manage, and mitigate such exposures.

(ii) Review legal and regulatory matters that may have a significant impact on the financial statements, related Company compliance policies and programs and material reports or inquiries received from regulatory agencies.

(j) Code of Conduct. The Committee will review and approve the Company's Code of Conduct satisfying the requirements of the Exchange Act and oversee and monitor compliance under this Code of Conduct.

## SUBSTANTIVE ALLEGATIONS

**Background**

64. MGP Ingredients describes itself as a leading producer of premium distilled spirits, branded spirits, and food ingredient solutions.

65. As one of the largest distillers in the United States, MGP Ingredients' offerings include bourbon and rye whiskeys, gins, and vodkas.

66. With distilleries in Kentucky, Kansas, Indiana, and Mexico, and bottling operations in Missouri, Ohio, and Northern Ireland, MGP Ingredients has the infrastructure and expertise to create on any scale.

67. MGP Ingredients' branded spirits portfolio covers a wide spectrum of brands in every segment, including iconic brands from Luxco, which was founded in 1958 by the Lux Family.

68. Luxco is a leading producer, supplier, importer and bottler of beverage alcohol products.

69. Luxco's award-winning spirits portfolio includes well-known brands from five distilleries: Bardstown, Kentucky-based Lux Row Distillers, home of Ezra Brooks, Rebel, Blood Oath, David Nicholson and Daviess County; Lebanon, Kentucky-based Limestone Branch Distillery, maker of Yellowstone Kentucky Straight Bourbon Whiskey, Minor Case Straight Rye Whiskey and Bowling & Burch Gin; Jalisco, Mexico-based Destiladora González Lux, producer of 100% agave tequilas, El Mayor, Exotico and Dos Primos; and MGP Ingredients' historic Ross & Squibb Distillery in Lawrenceburg, Indiana, where the Remus Straight Bourbon Whiskey and Rossville Union Straight Rye Whiskey are produced.

70. The innovative and high-quality brand portfolio also includes Everclear Grain Alcohol, Pearl Vodka, Saint Brendan's Irish Cream, The Quiet Man Irish Whiskey, and other well-recognized brands.

71. In addition, the Company's Ingredient Solutions segment offers specialty proteins and starches that help customers harness the power of plants and provide a host of functional, nutritional, and sensory benefits for a wide range of food products.

72. During the COVID-19 pandemic, alcohol consumption in the United States increased substantially. The Company benefitted greatly during this time period, as it increased alcohol production and sales, which in turn improved the Company's financial results.

73.    However, by late 2022, demand for alcohol started to decrease, and destocking of alcohol was taking place throughout the industry.

74.    As alleged below, during the Relevant Period, the Individual Defendants caused the Company to issue materially false and misleading statements regarding the Company's inventory.

75.    Despite the destocking taking place throughout the alcohol industry, the Individual Defendants assured the Company's stockholders that the Company "cycled through that" and sold a significant portion of its inventory. Defendants claimed that MGP Ingredients' exposure to overstocking was less than its competitors, and that destocking was "not a core issue" because Defendants had properly monitored and managed MGP Ingredients' inventory levels.

**Materially False and Misleading Statements**

76.    On May 4, 2023, the Individual Defendants caused MGP Ingredients to issue a press release, also filed with the SEC, wherein the Company announced its 2023 first quarter financial results.

77.    In the press release, Individual Defendant Colo commented that:

Sales of brown goods grew 10% from the prior year period to record levels, driven by strong new distillate customer commitments, higher pricing across all brown goods, and stronger than expected customer demand for spot purchases. Within our Branded Spirits segment, revenue grew 2% and we recently realigned our national distribution capabilities with Republic National Distributing Company ("RNDC") toward the end of the quarter. We believe this realignment with RNDC, as well as continued investment in our premium plus family of spirits brands, continues to position us well for incremental growth and margin expansion opportunities going forward.

78.    A corresponding earnings conference call was held, during which Individual Defendant Colo stated:

Sales of our premium beverage alcohol increased 2%, with continued strength in brown goods sales this quarter, supported by ongoing solid demand for our new distillate and aged whiskey. We remain confident that our significant share, scale advantage and our aging whiskey inventory position, will continue to support the

demand within the American whiskey category.

We're pleased with the improvement in demand visibility and consistency, that we achieved in brown goods as brown good sales growth continues to outpace longer-term market trends, and is primarily driven by craft as well as multinational customers. In an effort to moderate the impact of increased input costs, and excess supply available in the market, for industrial alcohol and white goods, as discussed on our previous call, we reduced the volumes produced and sold of our industrial alcohol and white goods products during the first quarter, to minimize the negative impact on our profitability.

79.     During the conference call, Colo further commented:

We are pleased with the solid results delivered this quarter, despite increased costs and broader macroeconomic uncertainty. Demand for our products in each of our three segments remains strong and we believe our business continues to be well positioned. We expect to maintain a high level of operational execution and remain deliberate in our actions, as we navigate the market dynamics this year, which is why we are reconfirming our full year fiscal 2023 guidance.

80.     In response to questions from analysts during the conference call, Colo stated:

[Analyst]: And then my follow-up question is on the commentary around inventories. Thank you very much for the incremental color on what it would have looked like or your top line would have looked like ex-Yellowstone. Can you comment at all on kind of more broadly like, what you're hearing from your wholesalers comfort around inventory levels, as we've gone through earnings season, it does seem -- and it's consistent with your script, there's a lot of caution around the US consumer. So I'm just kind of wondering, what wholesaler comfort level is with inventories today, what your comfort level is with your inventories today? Thank you.

[Colo]: Yes. I think in general, I'd say that the distributors may be hearing a little more inventory at this point than normal. However, kind of the other thing that I think, we're anticipating at the distributor level is with interest rates continuing to rise and at the level they are now. It wouldn't surprise us if some of the distributors maybe carried less inventory going forward, because their carrying costs are going to be significantly higher than they were even a year ago. But that's kind of a different issue than the demand side of the equation really to inventory, Vivien. But those are a couple of our observations in the market right now

[Analyst]: That's a really interesting consideration to call out. Is that factored into your full year guidance?

[Colo]: It is at this point, yes. . . .

[Analyst]: Question on inventory, would you expect inventory levels to stay somewhat elevated in relation to sales as the year progresses, or will that be worked down to kind of be more in line with the sales growth at the end of the year?

[Colo]: That's our expectation. Sean, we think that the year presses again particularly in line if you look at the carrying cost in the current interest rate environment we expect that inventory levels will pretty much -- shipments should equal to completions is the ideal way the industry runs and we anticipate that as the year plays out that's where the inventories will kind of normalize too.

81.    On November 2, 2023, the Individual Defendants caused MGP Ingredients to issue a press release, also filed with the SEC, wherein the Company announced its 2023 third quarter financial results.

82.    In the press release, Individual Defendant Colo commented that sales were "driven by strong demand for our new distillate and aged whiskey."

83.    A corresponding earnings conference call was held, during which Individual Defendant Colo stated:

Brown goods sales growth has continued to outpace longer term market trends and has been primarily driven by craft, as well as multinational customers. Our confidence in our brown goods sales visibility for the balance of the year remains high.

Looking ahead to fiscal 2024, our visibility is also improving as we believe we now have the vast majority of our expected Distilling Solutions segment brown goods sales for 2024 already committed.

We believe we are well positioned to support continued growth in the American whiskey category. We will continue to be strategic with our aged whiskey sales to enable us to meet expected customer needs for the balance of this year, as well as position us to meet anticipated customer needs in the coming years.

84.    Colo further commented that Defendants "remain confident that inventory destocking for our brands is close to running its course, and we are focused on driving velocity and points of distribution across our portfolio of brands," and "[d]emand for our products in each of the three segments remain strong and we believe our actions will continue to position the

19

business for long-term success."

85.    In response to questions from analysts during the conference call, Colo and Individual Defendant Gall stated:

[Analyst]: A couple of questions. I guess, first on the Branded Spirits business, you talked that you were still working through some of kind of the excess inventory within channels and I think the whole industry is. I mean, any way to quantify like what sales could have been or how much that impacted branded sales, because still 6% year-over-year is pretty solid. So just trying to understand or did it really was a very small impact and no impact is expected going forward?

[Colo]: Yeah. I think, Bill, we discussed this a little bit on the last quarter call, but we feel like we are pretty much through any issues with excess inventory at the distributor level. There may be a few brands that we still have a little bit to work through, but there was really, I don't think our revenue was materially impacted due to any excess inventory issues in the channel. . . .

[Analyst]: Hi. Thank you. Good morning and I'd like to echo my congratulations to Dave. My first question is on the Distillery Products segment, another very nice quarter of price mix realization in premium beverage alcohol, of course, volumes are under pressure. I was wondering whether you could offer some commentary on kind of the volume dynamics between brown goods and white goods in the quarter, please? Thanks.

[Gall]: Yeah. Vivien, this is Brandon. So, yeah, in our Q, we do break out premium beverage alcohol, which includes both brown goods and white goods, and within that, we share that sales are up 13%, but volume to your point is off 15% and that 15% downdraft is all directly related to white goods and industrial alcohol. So our demand for our brown goods from a volume standpoint remains intact, but I will share the majority of the 28% growth in brown goods in the quarter was price driven. . . .

86.    During the conference call, Colo concluded:

[F]rom our perspective, on our inventories, et cetera, what we try to do is balance particularly on our aged side. Our inventory needs and build of inventory with our anticipated future customer needs and demand. And we are still in that position today, we make our laydown decisions based on those anticipated needs and we are not seeing anything today that would tell us that we, as a company, are imbalanced in that particular regard.

87.    The foregoing statements were materially false and misleading.

20

88.    Specifically, the foregoing statements omitted that: (i) the Individual Defendants did not fully grasp the decreasing demand in the alcohol industry; and (ii) MGP Ingredients failed to adjust its production and inventory levels and, therefore, the levels stayed significantly high despite the fact that demand decreased.

**The Truth Starts to Emerge**

89.    On February 22, 2024, the Individual Defendants caused MGP Ingredients to issue a press release, also filed with the SEC, wherein the Company announced its 2023 fourth quarter and full year financial results.

90.    In the press release, Individual Defendant Bratcher commented:

Demand for our new distillate and aged whiskey was strong, which resulted in brown goods sales increasing 39% and 26% for the fourth quarter and full year 2023, respectively, as compared to the prior year periods. . . . We are very pleased with our performance for the quarter and full year and remain confident in the long-term sustainability of our business model.

91.    However, the press release also disclosed weak revenue guidance for fiscal year 2024 in the range of $742 to $756 million, which was below analysts' estimates of $787.8 million.

92.    A corresponding earnings conference call was held, during which Individual Defendant Bratcher stated:

[I]nventory destocking at a wholesale level will remain an issue for the branded spirits industry in 2024. . . . [MGP Ingredients] work[ed] closely with our distributors throughout 2023 [and] made significant progress in managing wholesaler inventory for our portfolio. . . . Healthy demand for our products continue and we believe our business remains well-positioned. . . .

[M]ore than 90% of our new distillate whiskey sales volume is committed in 2024, compared to 50% of our aged whiskey sales volume committed. . . . We expect total aged whiskey revenues in 2024 to be less than 2023, due to our strategy of developing longer-term stability with new distillate and because of our success in working with longer-term craft customers, who started their brands with aged whiskey and are now moving into the new distillate market.

21

93.     In response to questions from analysts during the conference call, Individual

Defendants Gall and Bratcher stated:

[Analyst]: Just wanted to go back on the kind of the new distillate sales, and I think one of the things you said was total sales would be down in '24 versus '23. So if you maybe could give some more color, I think you kind of explained what was some customer changes and stuff like that, but try to understand that?

And then also, you had mentioned that you're monitoring the overall American whiskey supply levels, and that might be a headwind. So kind of maybe help us understand that? Are you talking about at retail or are you talking about supply of other players coming for new distillate?

[Gall]: Yeah, Bill. I'll start on that. Yeah, thanks for giving us the opportunity to clarify. So we do not expect new distillate sales to decline year- over-year. In fact, we expect brown goods sales in total to continue to grow in line with or better than the broader category of American whiskey in 2024. What we're trying to get across in our prepared remarks is that the proportion of new distillate sales versus aged sales has been growing. And that has been deliberate as David mentioned on the call. And the reason for that is as our customers that traditionally bought aged, as they continue to mature and grow, they're now better able to finance new distillate.

And so we're leaning into that because there's a lot of attributes of new distillate customers that we find attractive, such as the greater visibility they provide and the greater cash flow characteristics of sliding (ph) distillate versus aged brings. As far as moderating the overall supply to the industry, that's not our plan. We're continuing to grow with our portfolio and with our customers. And as such, the mix may change more towards new versus aged, but we continue to grow at the same pace or better than the American whiskey category as we've done in recent years. . . .

[Bratcher]: Yeah. I'll add to that too, just in clarification. The new distillate focus is really critical for our business. It gives us longer-term arrangements, financial stability, and visibility for multi-years on average. It's a better business for us in terms of understanding the impact financially on the overall business. It also is somewhat a normal cycle, as the category continues to grow and some of our previous craft customers become bigger, they're naturally going to switch over to new distillate supply, that's just normal. There is no -- we have no plans to moderate our supply to it.

As a matter of fact, we've taken just the opposite approach, as you heard in our call (ph) script, that we're expanding one of our major distilleries in Kentucky, basically doubling its capacity and we expect it to come online mid-year. So we're very optimistic about Branded sales and a plan to expand and continue to grow with the segment. . . .

22

[Analyst]: Got it. Now that helps. And then if I'm looking at the, just the aged demand, I understand that you're naturally kind of leaning into the new, but are you hearing from your customers, now you have 800 customers, any worries that there's going to be a slowdown in brown good demand three, four years out from now, or is kind of the overall interest pretty much the same as it has been the past few years?

[Bratcher]: I think what we could say on that is that if we look at our aged distillate and when you referenced about 50% of it being obligated, that's actually pretty high number on aged because most of these tend to be craft customers or new entrants into the category. So actually we feel pretty good about the amount that we have contracted and how that relates to any potential unknown is, is that, those the craft -- the craft distilleries or craft brand companies are subject to the same inventory, retail, wholesale level type of inventory situations as anybody.

And so with higher interest rates and everything else, they're being a little more cautious with their investment. In the past, we've saw them buy just so they could corner their piece of the business. Now you're starting to see them switch to more just-in-time type of demand. They want to transact, know they can fill the product and get it right through the shelf, given the high interest rates that they operate in. . . .

[Analyst]: Got it. And last question, just on the aged, sorry, on the Branded portfolio, your comments about there's still some destocking at distributors and stuff like that, does that mean, I thought most of the impact you kind of saw in the first half of last year, do you expect a quarter where we could be flat to down for that overall business, excluding Penelope or is most of the heavy destocking done?

[Bratcher]: The comment in general was about the industry overall. There is still a push on inventory destocking for the industry overall. As it relates specifically to our business, we've worked really hard in the past year to manage that -- actively manage that with our wholesalers. We believe we have it in a controllable area of data on hand. At the end of the day, the wholesalers do control the inventory and they place the order and they decide what the number is. I think our exposure on it for us is smaller than, let's say, our peer set because I think we've done a really good job of managing it in 2023.

94.    Following this news, the Company's stock price fell 14.86 percent, or by $13.65 per share, from $91.83 per share on February 21, 2024 to $78.18 per share the following day.

95.    On April 9, 2024, the Individual Defendants caused MGP Ingredients to file a proxy statement with the SEC (the "2024 Proxy").

96.    The 2024 Proxy solicited the Company's stockholders to:

23

1. Elect nine directors;

2. Ratify the appointment of KPMG LLP as our independent registered public accounting firm for 2024;

3. Approve, on an advisory basis, the compensation of our named executive officers;

4. Approve the MGP Ingredients, Inc. 2024 Equity Incentive Plan; and

5. Consider any other business as may properly come before the meeting and any postponements or adjournments of the meeting.

97.     With respect to Item 1 above, the 2024 Proxy provided:

Our Board of Directors, upon recommendation of its Nominating and Governance Committee, has nominated David S. Bratcher, Neha J. Clark, Thomas A. Gerke, Donn Lux, Preet H. Michelson, Lori L.S. Mingus, Kevin S. Rauckman, Karen L. Seaberg, and Todd B. Siwak for election as a director, to hold office for a one-year term and until their respective successor is elected and qualified or until their earlier death, resignation, or removal. Information regarding our director nominees can be found under "Board of Directors." . . .

OUR BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS A VOTE "FOR" THE ELECTION OF EACH OF THE NINE DIRECTOR NOMINEES

98.     With respect to Item 4 above, the 2024 Proxy provided:

On April 8, 2024, our Board, at the recommendation of its Human Resources and Compensation Committee (defined in this Proposal 4 as the "Committee"), approved the MGP Ingredients, Inc. 2024 Equity Incentive Plan (the "2024 Plan"), subject to approval by our stockholders at the Annual Meeting. The 2024 Plan will become effective on the date it is approved by our stockholders, and will replace our existing 2014 Plan and 2014 Non-Employee Director Equity Incentive Plan (together, the "Prior Plans"), which terminated following expiration of their ten-year terms on April 1, 2024. Equity awards made to non-employee directors after the effective date of the 2024 Plan will be made under the 2024 Plan (or a subplan thereof) instead of pursuant to a separate non-employee director equity plan.

The number of shares of our common stock that may be the subject of awards and issued under the 2024 Plan is 1,320,000, less one share of common stock for every one share of common stock granted under the Prior Plans after March 1, 2024 but prior to the effective date of the 2024 Plan. Awards outstanding under the Prior Plans as of the date the 2024 Plan becomes effective will continue to be subject to the terms of the applicable Prior Plan, and if any awards under the Prior Plans that were outstanding on March 1, 2024 subsequently expire, are forfeited or cancelled,

24

or are settled in cash, the shares subject to those awards will become available for awards under the 2024 Plan. No new awards will be made under the Prior Plans after their expiration date on April 1, 2024. . . .

OUR BOARD OF DIRECTORS RECOMMENDS A VOTE "FOR" THE APPROVAL OF THE MGP INGREDIENTS, INC. 2024 EQUITY INCENTIVE PLAN

99.    The 2024 Proxy further stated:

Our Board as a whole has ultimate responsibility for risk oversight. It exercises this oversight function through its standing committees, each of which has primary risk oversight accountability for matters relating to their respective area of responsibility, as detailed below. The independent structure of our Board and Board committees allows for objective risk oversight.

•Audit Committee: Oversees the integrity of our financial statement and financial reporting process, risks related to our financial reporting practices and internal controls, and our enterprise risk management ("ERM") process, which includes cybersecurity risks.

As part of our ERM process, management regularly identifies, evaluates, and prioritizes potential risks and creates a risk register of these risks. Our executive management team and business unit leaders decide on actions and strategies to use to mitigate our risks based on this risk register. Our ERM process and risk register were reviewed with the Audit Committee, along with our strategies for managing our risks, at three meetings during 2023.

•Human Resources and Compensation Committee: Oversees risks related to our compensation policies and practices as well as human capital management.

•Nominating and Corporate Governance Committee: Oversees risks related to our corporate governance, governance structure, Board composition, Board independence, as well as environmental, social, and governance ("ESG") matters, except those matters overseen by another Board committee (such as human capital management). . . .

Our Board has adopted Corporate Governance Guidelines, which are available on the Governance page of the Investor Relations section of our website at ir.mgpingredients.com/corporate-governance/governance-documents, along with our Board committee charters and Code of Conduct.

100.    The 2024 Proxy was materially false and misleading because it omitted that: (i) the

Individual Defendants did not fully grasp the decreasing demand in the alcohol industry; (ii) MGP

25

Ingredients failed to adjust its production and inventory levels and, therefore, the levels stayed significantly high despite the fact that demand decreased; (iii) by recommending that the Company's stockholders approve the MGP Ingredients, Inc. 2024 Equity Incentive Plan, the Individual Defendants were wrongfully interested in increasing their compensation for the future; (iv) the Individual Defendants violated MGP Ingredients' Code of Conduct; and (v) the Individual Defendants failed to fulfill their risk oversight responsibilities.

101. Due to the Individual Defendants' materially false and misleading statements, the Company's stockholders voted to approve the Items referenced above.

102. On May 2, 2024, the Individual Defendants caused MGP Ingredients to issue a press release, wherein the Company announced its 2024 first quarter financial results.

103. A corresponding earnings conference call was held, during which Individual Defendant Bratcher stated that MGP Ingredients' inventory "stabilized" and that it "worked really hard with our distributors and understanding the inventory levels and managing [how] to meet customer demand."

104. Bratcher further stated that "destocking for us at a distributor level is not a core issue" and MGP Ingredients was able to "get that inventory manage[d] to the right level[.]"

105. Individual Defendant Gall further claimed that MGP Ingredients "continue[s] to monitor the potential impact of inventory levels at distributors overall, American whiskey supply and consumption patterns and inflation" and was "uniquely positioned to grow as a company in this dynamic operating environment."

106. On August 1, 2024, the Individual Defendants caused MGP Ingredients to issue a press release, wherein the Company announced its 2024 second quarter financial results.

107.    A corresponding earnings conference call was held, during which Individual Defendant Bratcher stated that he was:

[P]roud of our sales team for their nimbleness as they continue to work with our branded customers to help them successfully adapt to the current consumption and inventory patterns at distributor and retailer levels. . . . Distributor inventories for our branded portfolio remain relatively stable, even below historical levels. . . . Distributor inventory levels for our brands are in good shape. . . . [I]nventory is exactly where we need . . . [and MGP Ingredients] continue[d] to monitor [inventories] on a daily basis.

108.    The foregoing statements were materially false and misleading because they omitted that: (i) the Individual Defendants did not fully grasp the decreasing demand in the alcohol industry; and (ii) MGP Ingredients failed to adjust its production and inventory levels and, therefore, the levels stayed significantly high despite the fact that demand decreased.

109.    On October 17, 2024, the Individual Defendants caused MGP Ingredients to issue a press release, wherein the Company announced its preliminary 2024 third quarter financial results.

110.    The press release stated that MGP Ingredients expected a fourteen percent decrease in sales year over year, and, accordingly, the Company would be downwardly adjusting its guidance.

111.    In the press release, Individual Defendant Bratcher stated:

Soft alcohol spirits category trends and elevated industry- wide whiskey inventories are putting greater than expected pressure on our brown goods business with a larger impact on our smaller, craft customer base. We expect these industry headwinds to persist at least through the rest of the year and will share details about our 2025 outlook with our fourth quarter 2024 earnings release.

112.    Following this news, the Company's stock price fell 29.5 percent, or by $24.07 per share, from $81.57 per share on October 17, 2024 to $57.50 per share on October 22, 2024.

27

113.    On October 31, 2024, the Individual Defendants caused MGP Ingredients to issue a press release, wherein the Company announced its 2024 third quarter financial results.

114.    The press release stated that, because of "the softening American whiskey category trends and elevated industry-wide barrel inventories," MGP Ingredients had to "further lower our net aging whiskey put away, scale down our whiskey production, and optimize our cost structure to mitigate lower production volumes."

115.    A corresponding earnings conference call was held, during which Individual Defendant Gall stated that MGP Ingredients would be "significantly reducing our brown goods production to better align with demand in 2025. At the same time, softer American whiskey growth and elevated barrel inventories continue to constrain demand for aged whiskey and increasingly our new distillate."

116.    Moreover, Individual Defendant Bratcher stated: "slower growth and higher inventories are leading to lower demand, lower prices and reduced visibility on our contract distilling sales."

117.    In response to questions from analysts during the conference call, Bratcher stated:

[Analyst]: we've seen a slowdown in American whiskey consumption now for 12, almost 18 months. And so I guess the surprise factor is that you're just realizing it, seeing it now. . . .

[Analyst]: Okay. Then getting back to the -- it does surprise me that industry-wide everybody sort of missed the slowdown. I'm curious whether any of that has to do with any on-premise, off-premise trends that may have been missed?

And then the second question is, what also may have been missed, which I've been seeing for a while is, consumer liquor cabinet destocking. Once you can -- once you're able to get your favorite brand back during the COVID error, it was hard to find it. And if you found a bottle or 2, you bought 2 or 3 or 4 bottles because you weren't sure you were ever going to see them again.

And I guess at some point, consumers decided -- they felt more comfortable with starting to see their favorite brands on the shelves and starting to -- instead of buying

it, just going through their own cabinet and reducing their own inventory, I guess there's no way -- Have you done any research on that part of the equation as far as the slowdown in consumption is concerned? And just also the comments on the premise versus -- on-premise versus off-premise missing the slowdown here?

[Bratcher]: Okay. And I'll take that one. So in general, if you think about on-premise versus off-premise, the mix is roughly the same, but the problem post-COVID, there's not as many as on-premises there was. So you're still seeing that being relaunched over time. I'm not going to attribute that mix to the industry's view on why it happened. I tend to take more of a macro view on this. I tend to think that we're in the middle of an election. We've had all kinds of interesting things going on in the environment. Consumer spending is a little bit slower than this.

I think there's a lot of external pressures going on here that is making that consumer make different choices, all right? And so I don't want to speculate on they're selling more there or not selling more there. I'm attributing it to that consumer. I also bring it back to this COVID piece. Having done this for 30 years in the brands, what we're selling back to is about what we should be in the industry. COVID was great for our industry for the period of time.

And now when we all reflect back and we look at these last few years of correction, and it is inventory destocking at a wholesaler, it is inventory destocking in a pantry. You've got multitudes of variables coming to a head. Those 2 shall pass. Now what we all are terrible at doing, myself and everybody else in the industry is telling you exactly when that's going to pass. You know why? Because we can't read the consumers' minds. We can only watch what they're doing and react to their needs.

118.    Following this news, the Company's stock price fell 14.7 percent, or by $8.27 per share, from $56.31 per share on October 30, 2024 to $49.04 per share the following day.

119.    On December 20, 2024, MGP Ingredients announced that Individual Defendant Bratcher was departing the Company and that Gall would become Interim CEO.

**Insider Sales**

120.    During the Relevant Period, while the Company's stock price was artificially inflated, Individual Defendants Lux, Mingus, and Seaberg engaged in improper insider sales, netting total proceeds of approximately $14.2 million.

121.    Individual Defendant Lux's insider sales are set forth below:

29

| DATE | SHARES SOLD | SHARE PRICE | TOTAL SALE PROCEEDS |
|---|---|---|---|
| May 10, 2023 | 10,000 | $83.00 | $829,970 |
| May 13, 2023 | 22,000 | $82.84 | $1,822,567 |
| June 9, 2023 | 2,005 | $101.69 | $203,888 |
| June 12, 2023 | 8,000 | $101.56 | $812,480 |
| May 14, 2024 | 20,000 | $82.30 | $1,645,980 |
| May 15, 2024 | 15,000 | $81.90 | $1,228,470 |
| TOTAL | 77,005 | | $6,543,355 |

122.    Individual Defendant Mingus's insider sales are set forth below:

| DATE | SHARES SOLD | SHARE PRICE | TOTAL SALE PROCEEDS |
|---|---|---|---|
| May 25, 2023 | 608 | $99.71 | $60,624.00 |
| May 26, 2023 | 400 | $97.34 | $38,937.00 |
| May 30, 2023 | 3,692 | $94.92 | $350,437.00 |
| June 9, 2023 | 1,096 | $101.06 | $110,761.00 |
| July 3, 2023 | 2,268 | $106.61 | $241,780.00 |
| August 1, 2023 | 320 | $112.62 | $36,038.00 |
| August 2, 2023 | 324 | $113.19 | $36,673.00 |
| August 8, 2023 | 1,215 | $122.17 | $148,436.00 |
| September 1, 2023 | 591 | $120.32 | $71,109.00 |
| October 2, 2023 | 383 | $104.69 | $40,096.00 |
| November 1, 2023 | 108 | $93.92 | $10,143.00 |
| December 4, 2023 | 1,061 | $90.63 | $96,158.00 |
| January 2, 2024 | 354 | $99.21 | $35,120.00 |
| February 15, 2024 | 113 | $90.00 | $10,170.00 |

| May 22, 2024 | 2,430 | $78.88 | $191,678.00 |
| August 23, 2024 | 2,764 | $90.46 | $250,031.00 |
| September 4, 2024 | 100 | $90.02 | $9,002.00 |
| TOTAL | 17,827 | | $1,737,193.00 |

123.    Individual Defendant Seaberg's insider sales are set forth below:

| DATE | SHARES SOLD | SHARE PRICE | TOTAL PROCEEDS |
|---|---|---|---|
| May 25, 2023 | 608 | $99.71 | $60,624 |
| May 26, 2023 | 400 | $97.34 | $38,937 |
| May 30, 2023 | 3,692 | $94.92 | $350,437 |
| June 20, 2023 | 985 | $101.70 | $100,174 |
| July 3, 2023 | 4,264 | $106.59 | $454,499 |
| July 5, 2023 | 7,334 | $106.58 | $781,657 |
| August 2, 2023 | 880 | $113.57 | $99,941 |
| September 5, 2023 | 853 | $117.22 | $99,988 |
| October 2, 2023 | 1,414 | $103.46 | $146,296 |
| October 3, 2023 | 9,204 | $102.24 | $941,016 |
| November 1, 2023 | 1,073 | $93.20 | $100,003 |
| December 4, 2023 | 1,110 | $90.09 | $99,999 |
| January 2, 2024 | 2,544 | $99.09 | $252,079 |
| January 3, 2024 | 9,345 | $96.30 | $899,923 |
| February 16, 2024 | 3,329 | $90.11 | $299,976 |
| August 23, 2024 | 12,092 | $90.64 | $1,095,970 |
| September 4, 2024 | 1,109 | $90.14 | $99,965 |
| TOTAL | 60,236 | | $5,921,484 |

**Share Repurchases**

124.    The Individual Defendants caused MGP Ingredients to complete repurchases of the Company's common stock during the Relevant Period.

125.    According to the Company's SEC filings: (i) between March 1 and March 31, 2024, MGP Ingredients repurchased 59,084 shares for nearly $5 million; (ii) between May 1 and May 31, 2024, MGP Ingredients repurchased 33,363 shares for nearly $2.5 million; and (iii) between July 1 and July 31, 2024, MGP Ingredients repurchased 35,913 shares for nearly $2.5 million.

126.    Accordingly, during the Relevant Period the Individual Defendants caused the Company to spend a total of about $10 million to repurchase about 128,360 shares of the Company's common stock at artificially inflated prices. This was an overpayment of about $3.7 million.

**The Securities Class Action**

127.    As a result of the foregoing, the Securities Class Action was filed against the Company, Bratcher, Colo, and Gall, captioned *In re MGP Ingredients, Inc. Securities Litigation*, Case No. 1:24-cv-09685 (S.D.N.Y.).

128.    As a result, MGP Ingredients has incurred, and will continue to incur, substantial costs to defend itself in the Securities Class Action, and is exposed to massive potential class-wide liability.

<u>**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**</u>

129.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

130. MGP Ingredients is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

131. Plaintiff is a current shareholder of MGP Ingredients and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

132. A pre-suit demand on the Board of MGP Ingredients is futile and, therefore, excused. During the illegal and wrongful course of conduct at the Company and to the present, the Board consisted of Defendants Clark, Gerke, Lux, Michelson, Mingus, Rauckman, Seaberg, and Siwak.

133. Given the factual allegations set forth herein, Plaintiff has not made a demand on the Board to bring this action against the Individual Defendants. A pre-suit demand on the Board would be futile as there is reason to doubt that a majority of the members of the Board is capable of making an independent and/or disinterested decision to initiate and vigorously pursue this action.

134. The Individual Defendants either knew, or should have known, that the statements they issued, or caused to be issued on the Company's behalf, were materially false and misleading, but they took no steps in a good faith effort to prevent or remedy that situation.

135. Each of the Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

33

136.    Each of the Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

137.    Additionally, each of the Individual Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

138.    Individual Defendants Clark, Gerke, Michelson, and Rauckman are not disinterested or independent.  Clark, Gerke, Michelson, and Rauckman are members of the Audit Committee, the purpose of which is to assist the Company's directors with fulfilling their oversight responsibilities regarding, among other things, accounting, legal, regulatory, and public disclosure requirements. Therefore, Clark, Gerke, Michelson, and Rauckman knowingly or recklessly allowed the issuance of the aforementioned improper statements.

139.    Defendants Clark, Gerke, Michelson, Mingus, Rauckman, Seaberg, and Siwak are not disinterested or independent.  Clark, Gerke, Michelson, Mingus, Rauckman, Seaberg, and Siwak are members of the Nominating and Governance Committee, the purpose of which includes overseeing the corporate governance policies and procedures of the Company.  Defendants Clark, Gerke, Michelson, Mingus, Rauckman, Seaberg, and Siwak failed to review regulatory developments and governance best practices for the Company and allowed the Individual Defendants to disseminate material misinformation as set forth above.

140.    Individual Defendants Lux, Mingus, and Seaberg are not disinterested or independent. Lux, Mingus, and Seaberg engaged in improper insider sales while in possession of

34

material non-public information about the Company, netting total proceeds of approximately $14.2 million.

141.    Individual Defendants Clark, Gerke, Lux, Michelson, Mingus, Rauckman, Seaberg, and Siwak are not disinterested or independent. Clark, Gerke, Lux, Michelson, Mingus, Rauckman, Seaberg, and Siwak caused the issuance of the 2024 Proxy. As alleged above, due to the Individual Defendants' materially false and misleading statements in the 2024 Proxy, the Company's stockholders voted to approve Items 1-4 in the 2024 Proxy, including the election of the Individual Defendants to the Board and the approval of the MGP Ingredients, Inc. 2024 Equity Incentive Plan. Thus, Clark, Gerke, Lux, Michelson, Mingus, Rauckman, Seaberg, and Siwak are not disinterested or independent, and demand upon them would be futile.

142.    Individual Defendant Lux is not disinterested or independent. According to the 2024 Proxy, Lux owns 7,963,169 shares of the Company's common stock, or approximately 36.2 percent of the Company's shares. Lux served as President and CEO of Luxco, which the Company merged with in April 2021, from 1991 until March 2021, and as Chairman of Luxco from 2010 until March 2021. Bratcher served in several leadership roles at Luxco since his hire in 1998 as Director of Operations, including as President of Luxco from 2013 until the April 2021 merger with Luxco. The 2024 Proxy concedes that Lux is not independent. *See* 2024 Proxy at 10. Thus, Lux is not disinterested or independent, and demand upon him would be futile.

143.    Accordingly, a pre-suit demand on the Board is futile and, therefore, excused.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

144.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

145.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

146.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

147.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

148.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

149.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## COUNT II

### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

150.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

151.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

152.    Plaintiff, on behalf of MGP Ingredients, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

153.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

154.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, MGP Ingredients.

155.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from MGP Ingredients that was tied to the performance or artificially inflated valuation of MGP Ingredients, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

156.    Moreover, as alleged herein, Individual Defendants Lux, Mingus, and Seaberg engaged in improper insider sales while in possession of material non-public information about the Company, netting total proceeds of approximately $14.2 million.

157.    Plaintiff, as a shareholder and a representative of MGP Ingredients, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

158.    Plaintiff on behalf of MGP Ingredients has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Waste of Corporate Assets

159.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

160.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.  It resulted in continuous, connected, and ongoing harm to the Company.

161.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Class Action.

162.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

163.    Plaintiff, on behalf MGP Ingredients, has no adequate remedy at law.

<u>**COUNT V**</u>

**Against the Individual Defendants for Violations of Section 14(a)
of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9)**

164.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

165.    The Individual Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

166.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that "[i]t shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

167.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9.

168.    The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2024 Proxy, which was filed with the SEC.

169.    As alleged above, the 2024 Proxy was materially false and misleading because it omitted that: (i) the Individual Defendants did not fully grasp the decreasing demand in the alcohol

industry; (ii) MGP Ingredients failed to adjust its production and inventory levels and, therefore, the levels stayed significantly high despite the fact that demand decreased; (iii) by recommending that the Company's stockholders approve the MGP Ingredients, Inc. 2024 Equity Incentive Plan, the Individual Defendants were wrongfully interested in increasing their compensation for the future; (iv) the Individual Defendants violated MGP Ingredients' Code of Conduct; and (v) the Individual Defendants failed to fulfill their risk oversight responsibilities.

170.    The misrepresentations and omissions in the 2024 Proxy were material to Company stockholders. Specifically, the misrepresentations and omissions were material to Company stockholders in voting on matters set forth for shareholder determination in the 2024 Proxy, including, but not limited to, the reelection of certain Individual Defendants and the approval of the MGP Ingredients, Inc. 2024 Equity Incentive Plan.

171.    The Company was damaged as a result of Defendants' material misrepresentations and omissions in the 2024 Proxy.

172.    As a result of the Individual Defendants' material misrepresentations and omissions, the Company has sustained significant damages.

173.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

### COUNT VI

**Against the Individual Defendants for Violations of Section 10(b)
of the Exchange Act, 15 U.S.C. § 78(j), and Rule 10b-5, 17 C.F.R. § 240.10b-5**

174.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

175.    The Individual Defendants participated in a scheme with the purpose and effect of defrauding MGP Ingredients. Not only is MGP Ingredients now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself

is also one of the largest victims of the unlawful scheme perpetrated upon MGP Ingredients by the Individual Defendants.

176. During the Relevant Period, while the price of the Company's stock was artificially inflated as a result of the false and misleading statements issued, the Individual Defendants caused the Company to overpay by approximately $3.7 million to repurchase approximately 128,360 shares of MGP Ingredients common stock.

177. The Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

178. The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about MGP Ingredients not misleading.

179. The Individual Defendants, as directors and officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by MGP Ingredients.

180. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to

ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

181.    The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have caused the Company to expend approximately $10 million in the repurchase of MGP Ingredients stock at artificially inflated prices and have exposed the Company to millions of dollars in potential class-wide damages in the Securities Class Action.

182.    By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

183.    Plaintiff, on behalf of MGP Ingredients, has no adequate remedy at law.

## COUNT VII

### Against the Individual Defendants
### For Violations of Section 20(a) of the Exchange Act

184.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

185.    The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions of control within the Company, the Individual Defendants had the authority to cause the Company to issue materially false and misleading statements, and to repurchase MGP Ingredients stock at prices artificially inflated by those materially false and misleading statements.

186.    Plaintiff, on behalf of MGP Ingredients, has no adequate remedy at law.

## COUNT VIII

### Against Individual Defendants Bratcher, Colo, and Gall for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

187. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

188. MGP Ingredients and Individual Defendants Bratcher, Colo, and Gall are named as defendants in the Securities Class Action, which asserts claims under federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder by the SEC. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole, or in part, due to Defendants Bratcher's, Colo's, and Gall's willful and/or reckless violations of their obligations as officers and/or directors of MGP Ingredients.

189. Defendants Bratcher, Colo, and Gall, because of their positions of control and authority as officers and/or directors of MGP Ingredients, were able to, and did, directly and/or indirectly, exercise control over the business and corporate affairs of MGP Ingredients, including the wrongful acts complained of herein and in the Securities Class Action.

190. Accordingly, Defendants Bratcher, Colo, and Gall are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

191. As such, MGP Ingredients is entitled to receive all appropriate contribution or indemnification from Defendants Bratcher, Colo, and Gall.

192. Plaintiff, on behalf MGP Ingredients, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.      Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.      Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.      Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to:

•       strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

•       strengthening the Company's internal reporting and financial disclosure controls;

•       developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board; and

•       strengthening the Board's internal operational control functions;

D.      Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

44

E.        Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: March 17, 2025

**WALTERS, RENWICK,
RICHARDS & VAUGHAN, P.C.**

By:   */s/ Karen Wedel Renwick*

**OF COUNSEL:**

Karen Wedel Renwick, D. Kan. #12095
R. Frederick Walters, D. Kan. #70561

**RIGRODSKY LAW, P.A.**
Timothy J. MacFall
Gina M. Serra
825 East Gate Blvd., Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Facsimile: (302) 654-7530
tjm@rl-legal.com
gms@rl-legal.com

1100 Main Street, Suite 2500
Kansas City, MO 64105
Telephone: (816) 421 -6620
Facsimile: (816) 421-4747
krenwick@wrrvlaw.com
fwalters@wrrvlaw.com

*Attorneys for Plaintiff*

45

**VERIFICATION**

I, BRYAN REID, have reviewed the allegations made in this Verified Stockholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of MGP Ingredients, Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: 3/7/2025

Signed by:

Bryan Reid

C4984E808CB04CF...

BRYAN REID